IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| **TATUM FINOCCHIARO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.**  6:23-cv-540 |
| | ) | |
| **COLOPLAST CORP., and** | ) | **JURY TRIAL DEMANDED** |
| **COLOPLAST** | ) | |
| **MANUFACTURING** | ) | |
| **US, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Tatum Finocchiaro ("Plaintiff"), by and through her attorneys of record, and for her causes of action against Defendants Coloplast Corp., and Coloplast Manufacturing US, LLC, (collectively referred to as "Coloplast" or "Defendants") states and alleged as follows:

### INTRODUCTION

1.     On November 15, 2015, Plaintiff was surgically implanted with a T-Sling transvaginal mesh device, a pelvic mesh product and medical device designed, manufactured and marketed by Defendants.

2.     Although the device was intended to treat urinary incontinence, neither Plaintiff nor her healthcare providers were warned that the T-Sling was defective

and negligently designed and manufactured. As a result of being surgically implanted with Defendants' unreasonably dangerous defective pelvic mesh device, Plaintiff has suffered, and continues to suffer, debilitating injuries, as described further herein. Plaintiff brings this suit for damages related to those injuries.

## PARTIES

3.     Plaintiff is a citizen of Florida, domiciled in Deland, Florida. Plaintiff was implanted with and subsequently injured by Defendants' T-Sling vaginal mesh device in Volusia County, Florida.

4.     Defendant Coloplast Corp. ("Coloplast Corp.") is a citizen of Delaware and Minnesota. Coloplast Corp was incorporated in the State of Delaware and maintains its principal place of business in Minnesota located at 1601 West River Road North, Minneapolis, Minnesota 55411. Coloplast Corp. is a wholly-owned U.S. sales and marketing subsidiary of Coloplast A/S, a Denmark corporation.

5.     Defendant Coloplast Manufacturing US, LLC ("Coloplast Manufacturing") is a citizen of Delaware and Minnesota. Defendant Coloplast Manufacturing is a limited liability corporation organized and existing under Delaware law with its principal place of business in Minnesota located at 1940 Commerce Drive, North Mankato, MN, 56002. Its registered office is 560 Park Street, #6, St. Paul, Minnesota 55103. Coloplast Manufacturing US, LLC is a

wholly-owned subsidiary of Coloplast Corp. Coloplast Manufacturing's sole member is Coloplast Corp. which is a citizen of Minnesota and Delaware. At all times material hereto, neither Coloplast Manufacturing US, LLC, nor any of its members are or were citizens of the state of Florida.

6. Coloplast Corp., and Coloplast Manufacturing are collectively referred to herein as ("Coloplast").

7. All acts and omissions of the above-referenced Defendants as described herein were done by their agents, servants, employees, and / or owners, acting in the course and scope of their respective agencies, services, employments, and / or ownership.

## VENUE AND JURISDICTION

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this Judicial District. Plaintiff was implanted with and subsequently injured by Defendants' T-Sling product in Daytona Beach and Deland, Florida, which are in this judicial district. In addition, the Defendants do business in this judicial district, subjecting the Defendants to personal jurisdiction in this action.

9. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000)

exclusive of interest and costs and complete diversity of citizenship exists between the Plaintiff and Defendants.

## FACTUAL ALLEGATIONS

### A. General Factual Allegations

10.    This is an action to recover damages for personal injuries suffered by Plaintiff as a result of the implantation of the pelvic mesh medical device T-Sling, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants.

11.    At all relevant times, Defendants were in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, advertising, and delivering, and introducing into interstate commerce, including, inter alia, within the United States, either directly or indirectly through third parties, subsidiaries or related entities, pelvic mesh products which include the T-Sling device implanted in Plaintiff.

12.    At all relevant times, the pelvic mesh products were used to treat pelvic organ prolapse and/or stress urinary incontinence.

13.    A pelvic organ prolapse occurs when a pelvic organ, such as the bladder, drops ("prolapses") from its normal position and pushes against the walls of the vagina. Prolapse can happen if the muscles that hold the pelvic organs in place become weak or stretched from childbirth or surgery. More than one pelvic organ can prolapse at the same time. Organs that can be involved in a pelvic organ prolapse include the bladder, the uterus, the bowel and the rectum.

14.    Stress urinary incontinence ("SUI") is a type of incontinence characterized by leakage of urine during moments of physical stress. At all relevant times, the T-Sling was intended to be used, and for Plaintiff was used, to treat SUI.

15.    Surgical mesh, including mesh used in Defendants' pelvic mesh products, is a medical device that is generally used to repair weakened or damaged tissue. It is made from porous absorbable or non-absorbable synthetic material or absorbable biologic material. In urogynecologic procedures, surgical mesh is permanently implanted to reinforce the weakened vaginal wall to repair pelvic organ prolapse or to support the urethra to treat urinary incontinence. Many pelvic mesh products, including the T-Sling at issue in this case, are comprised of non-absorbable, synthetic, monofilament polypropylene mesh.

16.    Despite claims that polypropylene mesh is inert, the scientific evidence shows that this material implanted in Plaintiff is biologically incompatible with human tissue and when used as a woven or knitted alloplastic textile prosthetic mesh

for pelvic floor repair, polypropylene promotes a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendants' pelvic mesh products. This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, and causes chronic inflammation of the pelvic tissue, shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain. It also can cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the mesh.

17.     When these pelvic mesh products are inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

18.     In 1996, the FDA cleared the first pelvic mesh products for use in the treatment of SUI. These products include products manufactured, marketed, and distributed by Defendant. These products were and are approved by the FDA under the abbreviated 510(k) approval process. Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed before May 28, 1976.

19.    No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to these pelvic mesh products, including the T-Sling product at issue in this case.

**B. History of Defendants' Pelvic Mesh Products**

20.    Many of the Defendants pelvic mesh products were developed and/or acquired as a result of the acquisition by Coloplast of Mentor Corporation ("Mentor")'s surgical, urological, clinical, and consumer healthcare business segments in June 2006.

21.    On February 8, 2001, Mentor announced the purchase of Porges S.A., a subsidiary of Sanofi-Synthelabo. At the time, Porges held the leading market share for urological products in France and held a strong position throughout Europe was one of the largest manufacturers of urological products, supplying a complete range of products including pelvic mesh products.

22.    On January 24, 2005, Mentor applied for 510(k) clearance for a new product, the Aris Trans-Obturator Tape and Surgical Kit. In the 510(k) Summary (K050148) for the Aris, Defendant states "the Mentor Aris Trans-obturator Tape and the Kit are substantially equivalent in material, function, performance and design to the Mentor ObTape Trans-Obturator Tape and Surgical Kit cleared under 510(k) K031767 and K042851, respectively. It is also substantially equivalent to other

urethral support tape products currently on the market." The Aris received 510(k) clearance from the FDA on March 9, 2005.

23.    In May 2005, Mentor announced the U.S. launch of its new Aris Trans-Obturator Tape. According to Mentor's launch reports, "specifically designed to utilize Mentor's patented Trans-Obturator Technique (T.O.T.), Aris represents the newest technical achievement and advanced generation of trans-obturator slings for the treatment of stress urinary incontinence in women." "The introduction of Aris furthers Mentor's position as a pioneer of the trans-obturator method for treating stress incontinence in women," commented Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation. "We are committed to driving innovation in the field of women's health to provide better solutions for physicians and the patients they serve." Analytic Biosurgical Solutions ("ABISS") FDA registration lists its proprietary device as "Mentor Aris Trans-Obturator Tape and Surgical Kit."

24.    On October 12, 2005, ABISS and Mentor entered into a number of agreements pursuant to which ABISS licensed a number of ABISS' products to Mentor, which were thereafter marketed by Mentor under its trademarks, including its Aris trademark.

25.    On June 2, 2006, Mentor sold its surgical, urological, clinical and consumer healthcare business segments to Coloplast for $461,145,398, including

inter alia, Mentor's October 12, 2005, agreements with ABISS and Mentor's Aris and Novasilk Pelvic Mesh Products.

26.    At all times, the product marketed and sold in the United States as "Mentor Aris Trans-Obturator Tape and Surgical Kit" was manufactured by ABISS and, at all times after October 2, 2006, the product "Mentor Aris Trans-Obturator Tape and Surgical Kit" was exclusively marketed and sold in the United States by Coloplast Corp. from its principal place of business in Minneapolis, Minnesota.

27.    ABISS is registered with the FDA, Registration Number 3004756681, as the manufacturer of "Mentor Aris Trans-Obturator Tape and Surgical Kit.

28.    On December 5, 2005, Mentor obtained 510(k) clearance for Mentor NovaSilk Mesh. Mentor NovaSilk Mesh is a permanent, synthetic knitted propylene mesh that is square in shape and is a sterile, single use device. The Mentor NovaSilk Mesh obtained 510(k) clearance based on substantial equivalence in material, function, performance, and design to the Gynemesh Prolene Soft (Polypropylene) Mesh cleared under 510(k) K013718 and knitted polypropylene already in use under Mentor's Aris Sling cleared under 510(k) K050148. Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation commented, "The addition of NovaSilk to Mentor's expanding portfolio of women's health products for pelvic organ prolapse or stress urinary incontinence reinforces the commitment of our

urology franchise to surgeons and the patients they serve by providing high quality product offerings and customer service and support."

29.    Coloplast Corp.'s annual report for 2009-2010 reported that "the majority of our acquired patents and trademarks are associated with the acquisition of Mentor's urology, business in 2006." The annual report also said that Mentor signed "a non-competition clause prohibiting Mentor (the seller) from selling urology products for the next seven years…."

30.    Coloplast Corp. began marketing the Exair Prolapse Repair System in May 2009 to treat pelvic organ prolapse. This product is made of NovaSilk Mesh, precut into the necessary shape with four mesh arms extending from the main body, which are used to implant the device. This product obtained 510(k) clearance based on its substantial equivalence with Coloplast Corp.'s (formerly Mentor's) NovaSilk Mesh, and Gynecare Prolift Total Pelvic Floor Repair System cleared under pre-market notification number K071512 on May 15, 2008.

31.    On October 29, 2010, Coloplast Corp. acquired Mpathy Medical Devices, Inc. ("Mpathy"). Mpathy was founded in 2003, with the aim of developing less invasive surgical solutions for the treatment of female stress urinary incontinence and pelvic organ prolapse. Mpathy's core product lines included Minitape and Omnisure for stress urinary incontinence, and the Restorelle family for pelvic organ prolapse. Defendant Coloplast Corp. said of the acquisition that

Coloplast Corp.'s market position in Surgical Urology and Female Pelvic Health would immediately strengthen based on Mpathy's product portfolio including slings, mini-slings and meshes for stress urinary incontinence and pelvic floor repair and material portfolio including Smartmesh technology.

32.    In March 2005, Defendants, through themselves and/or their agents, applied to the FDA to clear the T-Sling mesh device through the 510(k) approval process.

33.    The T-Sling, at issue in this case, is an implantable support mesh made from monofilament polypropylene warp knitted into composite mesh.

34.    In 2006, the T-Sling was cleared by the Food and Drug Administration through "Substantial Equivalence" to the Ethicon TVT, the Tyco Healthcare IVS Tunneller, and the Herniamesh T-Sling devices under Section 510(k) of the Food, Drug and Cosmetic Act.

35.    Upon information and belief, at the time that Defendants first introduced its T-Sling to the market in 2006, the product had undergone inadequate pre-market testing to determine the safety and efficacy of the medical device prior to implantation in humans.

36.    After they began marketing the T-Sling, upon information and belief, Defendants performed no additional safety or efficacy testing in human vaginal tissues to confirm that the T-Sling device was safe and effective for use in women.

### C. Warnings Regarding Pelvic Mesh Products

37.    On July 13, 2011, the FDA issued a warning regarding serious complications associated with pelvic mesh products, such as the products manufactured, marketed, and distributed by Defendants.  In this warning, the FDA indicated that "serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**." (emphasis in the original).  The FDA had also received increased reports of complications associated with the pelvic mesh products used in both pelvic organ prolapse and stress urinary incontinence cases.

38.    The FDA Safety Communication also stated, "*Mesh contraction* (shrinkage) is a *previously unidentified risk of* transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

39.    The FDA Safety Communication further indicated that the benefits of using pelvic mesh products instead of other feasible alternatives did not outweigh the associated risks. Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risks."

40.    Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and

Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the "White Paper"). In the White Paper, the FDA noted that published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

41.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risks." (Emphasis in original).

42.     The White Paper further stated that "these products are associated with serious adverse events . . . Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair." In its White Paper, the FDA advises doctors to, inter alia, "[r]ecognize that in most cases POP can be treated successfully without mesh thus avoiding the risk of mesh related complications." The White Paper concludes by stating that the FDA "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

43.     On August 25, 2011, Public Citizen, a consumer advocacy group, submitted a petition to the FDA seeking to ban the use of pelvic mesh products in

pelvic repair procedures. In its Petition, Public Citizen warned that pelvic mesh products should be recalled because they offer no significant benefits but expose patients to serious risks and the potential for permanent life-altering harm. Joining Public Citizen as co-petitioners were Dr. L. Lewis Wall, a professor of obstetrics and gynecology at Washington University in St. Louis, and Dr. Daniel S. Elliott, a urologic surgeon specializing in female urology at the Mayo Clinic in Rochester, Minnesota.

44.    In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the transvaginal mesh inside the body as a serious complication associated with transvaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh… Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.

45.    The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

46.    As is known to Defendant, the risks associated with POP repair are the same as SUI repair. However, the data regarding the magnitude and frequency of these known risks are not as developed as the data on POP repair. The FDA recognized this, as demonstrated by its Section 522 Orders issued to manufacturers of pelvic mesh products used to treat SUI in January of 2012.

47.    In September 2011, the FDA acknowledged the need for additional data and noted in "Surgical Mesh for Treatment of Women with Pelvic Organ Prolapse and Stress Urinary Incontinence" that the literature and information developing on SUI repair with Pelvic Mesh Products "indicates that serious complications can occur . . . [and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh products used for SUI."

48.    After the 2011 FDA notification that mesh complications from POP repairs were "not rare," a 2013 article was published that stated: "as outlined in the FDA notifications, patients should be forewarned that some transvaginal mesh complications are life altering and might not always be surgically correctable. Furthermore, that study noted that "the women who received both MUS and TM represented a complicated surgical group. Fifteen women (43%) required MUS takedown concurrently with prolapse mesh excision. Two-thirds of these women had associated chronic pelvic pain and vaginal pain, in addition to their urinary symptoms."

49.     On April 16, 2019, the FDA ordered all manufacturers of surgical mesh intended for transvaginal repair of anterior compartment prolapse (cystocele) to stop selling and distributing their products immediately. In fact, the FDA has determined that the manufacturers, Boston Scientific and Coloplast specifically, have not demonstrated reasonable assurance of safety and effectiveness for these devices, which is the premarket standard that now applies to them since the agency reclassified them into class III (high risk) in 2016.[1]

50.     Defendants did not, and have not, adequately studied the extent of the risks associated with their pelvic mesh products. In January 2012, the FDA recognized the risk to women and mandated additional studies to further investigate these risks.

**D. Defective Design**

51.     Defendants knew or should have known that their Pelvic Mesh Products, including the T-Sling product at issue in this case, unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks. At the time Defendants began marketing the T-Sling, Defendants were aware that the T-Sling was associated with

---

[1] www.fda.gov/medical-devices/implants-and-prosthetics/urogynecologic-surgicalmesh-implants.

each and every one of the adverse events communicated by the FDA in its July 13, 2011, safety communication.

52.    The T-Sling was designed to be permanently implanted into a woman's body yet the product changes after implantation; it contracts over time which inter alia, can pull or compress nerves, muscles, and other soft tissues important for sexual function, mobility, bowel function, and bladder function. These product changes occur while the product is implanted.

53.    Moreover, despite their claims that polypropylene mesh is inert, Defendants were aware that the scientific evidence shows that this material as implanted in Plaintiff is biologically incompatible with human tissue and when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendants' Pelvic Mesh Products, including the T-Sling product at issue herein. Defendants were aware that this "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, causes chronic inflammation of the pelvic tissue, causes shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain, cause new-onset painful sexual relations, significant

urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the polypropylene mesh.

54.    The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction."

55.    Defendants make the following statements regarding its Pelvic Mesh Products:

> [Aris has] Low rate of particle release from the sling-minimizes increase in inflammatory response. Atraumatic, smooth edges allow for easy passage during implantation. Macroporous design allows for optimal tissue integration. (emphasis added).

56.    Contrary to Defendants' assertions that its products minimize increase in inflammatory response:

   a) In September 2009, results from a study were published in the BMC Women's Health relating to the comparison of host response and complications in patients implanted with Coloplast's Aris. Implants from the Aris group showed an increase risk of erosion which was quantified at 4%. Kaelin-Gambirasio I, Complications associated with transobturator sling procedures: analysis of 233 consecutive

cases with a 27 month follow-up. BMC Womens Health. 2009 Sep 25; 9:28.

b) In September 2012, results from a study were published in the World Journal of Urology relating to the comparison of TVT vs TOT slings. 15 of 71 patients suffered adverse events including infection and erosion, two thirds of which were implanted with the Aris. Wadie BS, TVT versus TOT, 2-year prospective randomized study. World J Urol. 2012 Sep 26.

57.    Defendants also make the following statements regarding their Pelvic Mesh Products:

Novasilk is one of the lightest weight, thinnest meshes on the market, which translates into a more conforming mesh that may reduce cases of inflammation, infection, or erosion by having less implanted material.

58.    Contrary to Defendants' assertions that their products are resistant to significant inflammation, infection or erosion:

a) Complications from mesh placement for pelvic organ prolapse include among other adverse events: acute and chronic infection, tissue contraction due to mesh shrinkage, erosion of the mesh into adjacent structures, and dyspareunia. [painful sexual intercourse]. Cosson, M., et al., Mechanical properties of synthetic implants used in the repair of prolapse and urinary incontinence in women: which

is the ideal material? Int Urogynecol J Pelvic Floor Dysfunct, 2003. 14(3): p. 169-78; discussion 178. Jones, K.A., et al., Tensile properties of commonly used prolapse meshes. Int Urogynecol J Pelvic Floor Dysfunct, 2009. 20(7): p. 847-53. Margulies, R.U., et al., Complications requiring reoperation following vaginal mesh kit procedures for prolapse. Am J Obstet Gynecol, 2008. 199(6): p. 678 e1-4.

b) Erosion can be defined as the mesh wearing, or slowly grinding through the vaginal wall. This is a serious complication and moreover, there is evidence that meshes shrink in vivo leading to increased stiffness, pain and poor restoration of the normal properties of the vagina. Dora, C.D., et al., Time dependent variations in biomechanical properties of cadaveric fascia, porcine dermis, porcine small intestine submucosa, polypropylene mesh and autologous fascia in the rabbit model: implications for sling surgery. J Urol, 2004. 171(5): p. 1970-3.

c) Larger pores within polypropylene mesh materials, allowing macrophage and leukocyte migration, reduce infection. Birch C, Fynes MM. The role of synthetic and biological prosthesis in reconstructive pelvic floor surgery. Curr Opin Obstet Gynecol.

2002; 14:527–595. 22. Govier FE, Kobashi KC, Kozlowski PM, Kuznetsov DD, Begley SJ, McGonigle KF, et al. High complication rate identified in sacrocolpopexy patients attributed to silicone mesh. J Urol. 2005; 65:1099–1103.

d) In a study published in August 2012, Defendant's Novasilk was compared to other polypropylene on the market relating structural properties. Novasilk was found to have less porosity and increased stiffness than several of the other studied products—supporting clinical observations among Plaintiff's surgeons and the causative conclusion that properties of Defendant's mesh led to Plaintiff's complications. Feola A, Characterizing the ex vivo textile and structural properties of syntheticprolapse mesh products. Int Urogynecol J. 2012 Aug 11.

59.    Defendants' Pelvic Mesh Products, including the T-Sling product at issue, were and are unreasonably susceptible to degradation and fragmentation inside the body, shrinkage or contraction inside the body, intense foreign body reaction, chronic inflammatory response, chronic wound healing, chronic infections in and around the mesh fibers, and nerve entrapment in the collagen scar formation. Defendants knew or should have known of these serious risks and should have,

therefore, warned physicians and patients regarding these risks to the extent they were known or knowable.

### E. Failure to Warn/Misrepresentation

60.     Despite this knowledge, Defendants continued to market the T-Sling device to the medical community and to patients as a safe, effective, and reliable medical device, implanted by safe, effective, and minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of SUI and other competing products.

61.     Defendants omitted and downplayed the risks, dangers, defects, and disadvantages of its pelvic mesh products, including the T-Sling product at issue, and advertised, promoted, marketed, sold and distributed the its pelvic mesh products, including the T-Sling product at issue, as safe medical devices when Defendants knew or should have known that the pelvic mesh products were not safe for their intended purposes, and that the products would cause, and did cause, serious medical problems, and in many patients, including Plaintiff, catastrophic injuries. Further, while some of the problems associated with the pelvic mesh products, including the T-Sling, were made known to physicians, the magnitude and frequency of these problems were not disclosed and were hidden from physicians.

62.     Prior to Plaintiff's implantation with this device, Defendants were on notice of numerous patients who had been harmed by its T-Sling vaginal mesh,

including a significant number of women who suffered vaginal erosion, infection, complex recurring extrusions, chronic vaginal, pelvic and groin pain, inability to engage in intercourse, perforation and / or abscess after implantation with its device.

63.    Defendants failed to design and establish a safe, effective procedure for removal of its pelvic mesh products, including the T-Sling product at issue, or to determine if a safe, effective procedure for removal of the pelvic mesh products exists.

64.    On information and belief, Defendants have not made any effort or spent any time, money or resources in educating physicians, or patients, in how, if at all possible, to safely remove the T-Sling mesh from a woman's body if complications occur.

65.    Defendants misrepresent the T-Sling mesh is safe and effective, while concealing the rate and magnitude of complications.

66.    Defendants intended patients and doctors to rely on these statements in choosing the T-Sling mesh.

67.    Defendants knew or should have known the statements were false.

68.    Defendants knew there was no adequate scientific data to support these statements.

69.    Defendants failed to conduct adequate research to determine whether these statements had any basis in fact.

70.    Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, groin mesh has high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making the T-Sling mesh defective under the law.

71.    Defendants have paid millions of dollars to individual consultant surgeons to adopt the device in their practice to induce other healthcare providers in purchasing their products. These "seeding trials" are a form of marketing conducted in the name of research by Defendants, specifically designed to target product sampling towards selected consumers.

72.    Defendants have paid millions of dollars to consultant surgeons to have access and control over data that would be published on the safety of the devices used by their consultant surgeons.

73.    Defendants have paid millions of dollars to individual consultants to help market their products and conceal the safety risks of their products to the medical community and public at large.

74.    Defendants have paid millions of dollars to individual consultants and groups to lobby and make misrepresentations on their behalf to healthcare providers,

safety organizations and the public and improperly influence articles and coverage related to their devices including the T-Sling mesh.

75.    These individual consultant surgeons have been paid millions of dollars by manufacturers of vaginal mesh devices, like the T-Sling mesh, without the knowledge of Plaintiff, her medical providers or the medical community. Defendants have improperly concealed the total amounts of money they have paid consultants and groups to market, lobby and make misrepresentations on their behalf related to the safety of their devices including the T-Sling mesh.

76.    In addition to the defects listed herein, the design of the T-Sling mesh causes adverse tissue reactions and tissue death with a chronic inflammatory response, the mesh becomes more rigid and stiff and hardens with the presence of mesh in the this area of the body, and the mesh is inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse reactions and serious and permanent injuries that surgeons are unable to effectively completely alleviate due to the adherence of the mesh and scar-plating around the mesh in the woman's groin and vagina.

77.    The T-Sling mesh is also defective due to Defendants' failure to adequately warn or instruct Plaintiff and / or her health care providers, while at the same time misrepresenting the safety and performance features of the T-Sling mesh.

78.    Defendants under reported and continue to underreport information about the propensity of the T-Sling mesh to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of the Products through various means and media.

79.    Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to the Product.

80.    Feasible, suitable and safer alternatives to the Product have existed at all times relevant that do not present the same the severity of risks as do the Product.

81.    The Products were at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the Instructions for Use ("IFU"), created the procedures for implanting the devices, distribute instructional videos and materials, and trained the implanting physicians.

82.    Defendants knowingly provided incomplete and insufficient training and information to physicians regarding the use of the Product and the aftercare of patients implanted with the Product.

83.    As a result of these life-altering and, in some cases, permanent injuries, Plaintiff has suffered severe emotional pain and injury and has suffered and will suffer apprehension of increased risk for injuries, infections, pain, mental anguish, discharge, and multiple corrective surgeries as a result of implantation of mesh.

84.    The Product implanted in the Plaintiff was in the same or substantially similar condition as it was when it left Defendants' possession, and in the condition directed by and expected by Defendants.

85.    In many cases, including Plaintiff's, women have been forced to undergo extensive medical treatment including, but not limited to, operations to locate and remove fragments of the mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

86.    Removal of segments of the contracted, curled, coiled, eroded, stiffened, small pore, scar-plated and / or infected transvaginal mesh can require multiple surgical interventions and result in further scarring on fragile compromised pelvic tissue and muscles.

87.    At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff named and the general public

on notice of the dangers and adverse effects caused by implantation of the T-Sling mesh.

88.    The T-Sling mesh as designed, manufactured, distributed, sold and / or supplied by Defendants was defective as marketed due to inadequate warnings, instructions, labeling and / or inadequate testing in the presence of Defendants' knowledge of lack of safety.

**F. Plaintiff's Use of Defendants' Mesh**

89.    On September 10, 2015, at the Atlantic Surgery Center in Daytona Beach, Florida, Plaintiff was implanted with a T-Sling vaginal mesh designed, manufactured, packaged, labeled and sold by Defendants. The subject mesh was intended to treat Plaintiff for stress urinary incontinence, the use for which Defendants marketed the product.

90.    Plaintiff's treating physician implanted the subject mesh properly and appropriately.

91.    On December 2, 2020, after suffering from pain and discomfort, pelvic pain, infections and erosion of the mesh through her urethra, Plaintiff underwent surgery to excise the mesh and reconstruct the urethra.

92.    On March 18, 2021, after suffering from additional pain and discomfort, Plaintiff underwent surgery for a pubovaginal sling using cadaveric dermal graft.

93.    As a direct and proximate result of the defective condition of the Coloplast T-Sling vaginal mesh, including but not limited to the wrongful acts, negligence, omissions and fraudulent representations of Defendants, Plaintiff suffered serious and permanent bodily injuries, including pelvic, groin and vaginal pain and suffering, complex extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding of the mesh, scar-plating, intervention for her pain, and the need for painful surgical interventions to remove segments of the coiled, stiff, chronically inflamed, small pore mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT I - NEGLIGENCE

94.    Plaintiff incorporates by reference paragraphs 10 - 93 of this Complaint as if fully set forth in this Count.

95.    At all times material hereto, Defendants had a duty to Plaintiff to exercise reasonable care in the design, manufacture, testing, inspection, processing,

advertising, marketing, testing, labeling, assembling, packaging, distribution, warning, detailing, promotion and sale of its T-Sling mesh device.

96. Defendants breached their duty and were negligent in that it failed to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, testing, labeling, assembling, packaging, distribution, warning, detailing, promotion and sale of its T-Sling mesh device.

97. As a result of said failures, the T-Sling mesh device implanted in Plaintiff was unreasonably dangerous and defective in design and unaccompanied by adequate warnings concerning its hazardous properties.

98. The unreasonably dangerous condition, defects and inadequate warnings existed when the T-Sling mesh device implanted in Plaintiff left Defendants' custody and control.

99. In addition, Defendants had an obligation to issue a timely post-sale warning regarding risks that became known after they either first began marketing its product and / or after Plaintiff was implanted with the T-Sling mesh device.

100. Defendants were negligent in that they failed to exercise reasonable care in failing to issue a timely post-sale warning regarding risks that became known after they either first began marketing its product and / or after Plaintiff was implanted with the T-Sling mesh device.

101.  At all times material, Defendants failed to exercise reasonable care under the circumstances, as they knew, or in the exercise of reasonable care, should have known, that their T-Sling mesh device was not properly manufactured, compounded, assembled, inspected, packaged, distributed, tested, analyzed, examined, or prepared, such that the medical device was defective, unreasonably dangerous, and likely to injure its users, including Plaintiff herein.

102.  Also, Defendants failed to exercise reasonable care under the circumstances, as they knew, or in the exercise of reasonable care, should have known, that their T-Sling mesh devices were sold without sufficient warnings or instruction (both before as well as after their sale), such that the T-Sling mesh device was likely to injure its users, including Plaintiff herein.

103.  Further, Defendants failed to exercise reasonable care under the circumstances, as it knew, or in the exercise of reasonable care, should have known, that their T-Sling mesh device and the information (including warnings, instructions, detailing, advertising, promotion, and representations) about the characteristics and properties of the devices; the potential risks associated with its use in patients; safety and efficacy data; the attributes of the device relative to other competing medical devices; and the management of patients after implantation of this device were inaccurate or incomplete, such that the medical device was likely to injure its users, including Plaintiff herein.

104.    Defendants also failed to conduct sufficient testing, quality assurance measures and / or inspection of its T-Sling mesh device, both prior to and after clearance of the product for sale, which, if properly performed, would have revealed or led, long ago, to the detection of defects in the T-Sling mesh device and inadequacy in the warnings, promotional materials and instructions which accompanied the device, such that the injuries suffered by Plaintiff herein could have been prevented.

105.    These negligent acts by Defendants resulted in the sale of T-Sling mesh device that was unreasonably dangerous, unsafe, and not reasonably fit for the uses and purposes for which the medical device would ordinarily be put or some other reasonably foreseeable purpose and the unreasonably dangerous condition existed when such device, including the particular device implanted in Plaintiff, left Defendants' custody and control.

106.    Defendants knew or should have known that the T-Sling mesh device subjected Plaintiff to unreasonably dangerous risks of which the Plaintiff and her treating physicians would not be aware. Nevertheless, Defendants advertised, marketed, sold and distributed the T-Sling mesh device for years to thousands of women, at a time when Defendants knew that there were safer methods and products available for the treatment of urinary incontinence.

107.   Had Plaintiff, her treating physician, or both known of the unreasonably dangerous risks associated with the T-Sling mesh device at the time of her implant surgery, such knowledge would have affected the treating physicians' use of the device and Plaintiff would not have consented to the implantation of the device.

108.   As a direct and proximate result of the defective condition of the T-Sling mesh device, including but not limited to the wrongful acts, omissions and fraudulent representations of Defendants, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for multiple painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

109.   As a direct, proximate and foreseeable result of Defendants' negligence, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT II – NEGLIGENT MISREPRESENTATION

110.   Plaintiff incorporates by reference paragraphs 10 - 93 of this Complaint as if fully set forth in this Count.

111.   As described in detail herein, Defendants made numerous false statements of material facts regarding the safety and efficacy of the T-Sling device to healthcare providers, and the community at large, including Plaintiff and Plaintiff's physicians. These statements were contained in advertisements, promotional materials, the T-Sling IFU, publications in journals, consulting and/or educational materials intended for healthcare providers, and other media.

112.   As described in detail herein, Defendants knew or should have known that these statements were false.

113.   In making these false statements, Defendants intended that Plaintiff and her healthcare providers rely on the representations so that they would purchase and use the T-Sling product as opposed to other, safer and more efficacious forms of treatment for SUI.

114.   As described in detail herein, Plaintiff and her treating physicians were not aware of the true extent of the risks of injury associated with the use of the T-Sling device at the time of implant, and they reasonably relied on the representations made by Defendants regarding the safety and efficacy of the T-Sling device to influence their decisions to purchase and implant the T-Sling device.

115.  As a direct and proximate result of the Defendants' negligent misrepresentations, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT III – GROSS NEGLIGENCE

116.  Plaintiff incorporates by reference paragraphs 10 - 93 of this Complaint as if fully set forth in this Count.

117.  In committing the acts and / or omissions set forth herein that directly and proximately caused Plaintiff's injuries, as set forth herein, Defendants breached

its duty to Plaintiff and demonstrated a conscious, reckless, willful and wanton indifference to and disregard of the consequences of its actions and / or omissions.

118.   Defendants were grossly negligent by showing a complete indifference for the safety and health of Plaintiff and other similarly situated, in negligently designing, packaging, labeling, marketing, advertising, promoting, distributing and selling a defective and unreasonably dangerous product and in negligently failing to warn Plaintiff of the significant risks and complications associated with its device, as set forth above.

119.   In light of the knowledge Defendants had concerning the risks and complications associated with its device, as set forth above, Defendants continued to show an utter disregard and complete indifference for the safety of Plaintiff by failing to provide adequate warnings concerning the risks and complications associated with its sling device, making material misrepresentations and placing profits from sales of its device over the safety of patients receiving its device.

120.   The wrongs done by Defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law would allow, and for which Plaintiff seeks exemplary damages, in that Defendants' conduct, including the failure to comply with applicable industry standards was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendants' standpoint at the time of the

conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff; or included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff.

121.   As a direct and proximate result of the Defendants' gross negligence, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT IV – STRICT LIABILITY: DESIGN DEFECT

122.    Plaintiff incorporates by reference paragraphs 10 - 93 of this Complaint as if fully set forth in this Count.

123.    The T-Sling mesh, as designed, was not reasonable safe for its intended use and was defective as described herein with respect to its design.

124.    The unique design features of T-Sling mesh, as described in detail herein, rendered the device unsafe, these design features include that the mesh is stiff, has small pores, is not compatible with human tissue, and is implanted in the groin and vagina.

125.    Feasible alternative designs were possible at the time of Defendants' manufacture of the T-Sling mesh implanted in Plaintiff.

126.    Other manufacturers of similar treatments and products had already put safer alternatives into use at the time of Defendants' manufacture of the T-Sling mesh implanted in Plaintiff.

127.    These safer alternatives minimized the risks associated with the unique design features of the T-Sling mesh, eliminated the risks associated with the unique design features, and eliminated or reduced the frequency, severity, and duration of the risks associated with the T-Sling mesh.

128.    As a direct and proximate result of the Defendants' defective design of the device, Plaintiff has suffered serious and permanent injuries, including pain and

suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT V – STRICT LIABILITY: FAILURE TO WARN

129.    Plaintiff incorporates by reference paragraphs 10 - 93 of this Complaint as if fully set forth in this Count.

130.    The T-Sling device implanted in Plaintiff was not reasonably safe for its intended uses and was defective, as described herein, as a matter of law due to its lack of appropriate and necessary warnings.

131.    Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of the Defendants' device, including, but not limited to, the heightened risks of erosion, pain, failure, and permanent injury, and the design

characteristics which exacerbated or created unreasonable risks, and material safety information about the device.

132.    In representations to Plaintiff and / or to Plaintiff's healthcare providers, Defendant failed to warn about the following risks, and others, involved with the use of the T-Sling:

a)    That the Defendants' mesh device was not as safe as other products, treatments and procedures available to treat incontinence;

b)    That the risk of adverse events with the Defendants' device was higher than with other products, treatments and procedures available to treat incontinence;

c)    The Defendants' device was not adequately tested;

d)    That Defendants deliberately failed to follow up on the adverse results from formal and informal reports from physicians and other healthcare providers and buried and / or misrepresented those findings;

e)    That Defendants were aware of dangers in the Defendants' device in addition to and above and beyond those associated with other products, treatments and procedures available to treat incontinence;

f)    That the Defendants' device was defective, and caused dangerous and adverse side effects, including but not limited to higher incidence of erosions, extrusions, adverse tissue response and rejection, contraction, migration, trauma, groin pain, vaginal pain, failure, and revision surgeries at a much more significant rate than other products, treatments and procedures available to treat incontinence;

g)    That patients needed to be monitored more regularly than usual while using the Defendants' device and that in the event the product needed to be attempted to revised or be removed that the

procedures to remove segments of the product had a very high failure rate and / or needed to be performed repeatedly;

h)    That the Defendants' device was manufactured negligently;

i)    That the Defendants' device was manufactured defectively;

j)    That the Defendants' device was designed negligently, and designed defectively.

133.    If the Defendants provided full and accurate warnings with the T-Sling device to the Plaintiff or her healthcare providers prior to the implantation, the T-Sling device would not have been implanted inside the Plaintiff. The inadequate warnings provided with the T-Sling proximately caused the Plaintiff's injuries.

134.    As a direct and proximate result of the Defendants' failure to warn, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has

incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT VI – STRICT LIABILITY: MANUFACTURING DEFECT

135.   Plaintiff incorporates by reference paragraphs 10 - 93 of this Complaint as if fully set forth in this Count.

136.   The T-Sling device implanted in Plaintiff was not reasonably safe for its intended use and was defective, as described herein, as a matter of law with respect to its manufacture in that the T-Sling deviated materially from the Defendants' design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to Plaintiff

137.   The Defendants' T-Sling device is inherently dangerous and defective, unfit and unsafe for its intended and reasonably foreseeable use, and does not meet or perform to the expectations of patients, including Plaintiff, and their healthcare providers, including Plaintiff's implanting surgeon.

138.   The T-Sling device creates risks to the health and safety of the patients, including Plaintiff, that are far more significant and devastating than the risks posed by other products and procedures available to treat the corresponding medical conditions and which far outweigh the utility of the T-Sling device.

139.   The device, as manufactured, did not perform as intended.

140.   The device was defective when it left the Defendants' control as a result of a flaw in the manufacturing process, workmanship, and / or materials of which the product was made.

141.   As a direct and proximate result of the Defendants' manufacturing defect, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex extrusions and erosions of the mesh in her body, chronic inflammation, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

### COUNT VII – FRAUDULENT CONCEALMENT

142.   Plaintiff incorporates by reference paragraphs 10 - 93 of this Complaint as if fully set forth in this Count.

143.   Defendants falsely and fraudulently have represented and continue to represent to the medical and healthcare community, Plaintiff, her treating physicians,

and the public that the T-Sling mesh device had been tested and were found to be safe and effective.

144.  Specifically, at all relevant times, including at the times Plaintiff consented to and was implanted with the T-Sling mesh, Defendants represented the T-Sling mesh device offered "high success and low complications," offered "permanent" treatment, and was "minimally invasive."

145.  Defendants touted, at all relevant times, including at the time Plaintiff consented to and was implanted with the T-Sling mesh, the design of the T-Sling mesh device minimized inflammation, minimized tissue trauma, offered "optimal tissue integration" and performed "similar to collagen fibers" where the mesh is implanted.

146.  Defendants touted, at all relevant times, including at the time Plaintiff consented to and was implanted with the T-Sling mesh, the design of the T-Sling mesh device contained large pores, was "less dense" than alternative mesh on the market and minimized tissue trauma.

147.  Defendants concealed the safety data on the design of the T-Sling mesh, specifically long-term data, was lacking, safety and efficacy of the T-Sling mesh was not established, there were high complication rates associated with the mesh, the mesh did not offer permanent treatment, the stiff and rigid characteristic of the mesh made it dangerous and increased the risks of injury in patients, the small pores of the

mesh made it dangerous and increased the risks of injury in patients, the mesh increased tissue trauma and tissue death when the stiff and rigid mesh was passed through the body, the mesh's design made it unreasonably susceptible to contracting, migrating, not holding in place and eroding through vaginal tissue and organs, the presence of the mesh in the groin offered no benefit in treating incontinence and caused injury to the groin nerve bundles and tissue and Defendants had no sufficient scientific basis for statements in the T-Sling mesh promotional materials, specifically but not limited to the T-Sling mesh was "similar to collagen" fibers in the vagina and groin and the design of the mesh minimized tissue trauma when passed through the body and minimized the inflammatory response.

148.    The representations made by Defendants were, in fact, false and the omissions were misleading and fraudulent. When Defendants made the representations and omissions, Defendants knew and / or had reason to know that those representations were false and the omissions were misleading, and Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in the representations and the dangers and health risks to users of the T-Sling mesh device, including Plaintiff and her treating physicians.

149.    These representations and omissions were made by Defendants with the intent of defrauding and deceiving the medical community, Plaintiff, her treating physicians, and the public, and also inducing the medical community, Plaintiff, her

treating physicians, and the public, to recommend, prescribe, dispense, and purchase the T-Sling mesh for use as a means of treatment for urinary incontinence, all of which evinced a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff.

150.    In representations to Plaintiff and / or to Plaintiff's healthcare providers, Defendant fraudulently concealed and intentionally omitted the statements described herein and below which were material in nature:

a)    That the Defendants' mesh device was not as safe as other products, treatments and procedures available to treat incontinence;

b)    That the risk of adverse events with the Defendants' device was higher than with other products, treatments and procedures available to treat incontinence;

c)    The Defendants' device was not adequately tested;

d)    That Defendants deliberately failed to follow up on the adverse results from formal and informal reports from physicians and other healthcare providers and buried and / or misrepresented those findings;

e)    That Defendants were aware of dangers in the Defendants' device in addition to and above and beyond those associated with other products, treatments and procedures available to treat incontinence;

f)    That the Defendants' device was defective, and caused dangerous and adverse side effects, including but not limited to higher incidence of erosions, extrusions, adverse tissue response and rejection, contraction, migration, trauma, groin pain, vaginal pain, failure, and revision surgeries at a much more significant rate than other products, treatments and procedures available to treat incontinence;

g) That patients needed to be monitored more regularly than usual while using the Defendants' device and that in the event the product needed to be attempted to revise or be removed that the procedures to remove segments of the product had a very high failure rate and / or needed to be performed repeatedly;

h) That the Defendants' device was manufactured negligently;

i) That the Defendants' device was manufactured defectively;

j) That the Defendants' device was designed negligently, and designed defectively.

151. Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of the Defendants' device, including, but not limited to, the heightened risks of erosion, pain, failure, and permanent injury, and the design characteristics which exacerbated or created unreasonable risks, and material safety information about the device.

152. Defendants had sole access to material facts concerning the defective nature of the products and their propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons who used the Defendants' device.

153. Defendants' concealment and omissions of material fact concerning the safety of the Product were made purposefully, willfully, wantonly, and / or recklessly to mislead, to cause Plaintiff's treating physician to recommend, purchase, prescribe, and / or dispense the device; and / or to mislead Plaintiff into reliance and cause Plaintiff to have the device permanently implanted in her body.

154.   At the time these representations and omissions were made by Defendants, and at the time Plaintiff was implanted with the device, Plaintiff and her treating physician were unaware of the falsehood of these representations, misleading nature of omissions and statements, and reasonably believed them to be true.

155.   Defendant knew and had reason to know that its device could and would cause severe and grievous personal injury to the patients implanted with the of the device, and that the device was inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

156.   In reliance upon these false representations, Plaintiff and her treating physician were induced to, and did use the device, thereby causing Plaintiff to sustain severe personal injuries and damages. Defendants knew or had reason to know that Plaintiff and her treating physician and other healthcare providers had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the use of the Defendants' device, as described in detail herein.

157.   Plaintiff and her treating physician reasonably relied on revealed facts provided by Defendants, but were unaware of purposefully suppressed and concealed facts that were critical to understanding the real dangers inherent in the use of the Defendants' device.

158.   If Plaintiff, her treating physician, or both would have been made aware of these purposefully suppressed and concealed facts, as set forth herein, Plaintiff would not have used or consented to the implantation of the device and her treating physician would have used the device differently, warned about it differently or not used it at all.

159.   Having knowledge based upon Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including but not limited to assuring Plaintiff, the public, and Plaintiff's healthcare providers and physicians, that the Defendants' device was safe for use as a means of providing relief from urinary incontinence and were as safe or safer than other products, treatments and / or procedures available and on the market. As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiff, her treating physician, and the public at large.

160.   Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff and Plaintiff's healthcare providers.

161.   The information distributed to the public, the medical community, Plaintiff, and her treating physicians by Defendants included, but was not limited to websites, information presented at medical and professional meetings,

information disseminated by sales representatives to physicians and other medical care providers, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Defendants' device.

162.   Defendants intentionally failed to inform the public, including Plaintiff and her treating physicians, of the high failure rate including erosion, extrusion, contraction, groin and vaginal pain, the difficulty or impossibility of removing the mesh, and the risk of significant irreversible injury.

163.   Defendants chose to over-promote the purported safety, efficacy and benefits of the Defendants' device instead.

164.   Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public, the medical community, Plaintiff, and her treating physicians; to gain the confidence of the public, the medical community, Plaintiff, and her treating physicians; to falsely assure them of the quality and fitness for use of the device; and induce Plaintiff, and her treating physician, the public and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Defendants' device.

165.   Defendant made claims and representations in its promotional materials to healthcare professionals and patients that the Defendants' device had innovative beneficial properties that increased the safety of the device which Defendants knew or should have known were false and misleading with the intention for patients and doctors to rely on the claims and choose Defendants' the device over safer alternatives.

166.   These representations, and others made by Defendants, were false when made and / or were made with the pretense of actual knowledge when such knowledge did not actually exist and were made recklessly and without regard to the true facts.

167.   These representations, and others made by Defendant, were made with the intention of deceiving and defrauding Plaintiff, Plaintiff's healthcare professionals and other members of the healthcare community, and were made in order to induce Plaintiff and her healthcare professionals to rely on misrepresentations and caused Plaintiff to purchase, rely, use, and request the Defendants' device and her healthcare professional to dispense, recommend, or prescribe Defendants' device.

168.   Defendants recklessly and / or intentionally represented false, dangerous, and serious health and safety concerns inherent in the use of Defendants'

device to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and / or not as safe as other alternatives.

169.    Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts, and made false representations for the purpose of deceiving and lulling Plaintiff and her treating physician into a false sense of security, so that Plaintiff and her treating physician would rely on Defendants' representations, and Plaintiff would request and purchase the Defendants' device and that her healthcare providers would dispense, prescribe, and recommend Defendants' device.

170.    Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Defendants' device.

171.    At the time the representations were made, Plaintiff and her treating physician did not know the truth about the dangers and serious health and / or safety risks inherent in the use of the Defendants' device. Plaintiff did not discover the true facts about the dangers and serious health and / or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

172.    Defendants' wrongful conduct constitutes fraud and deceit and was committed and perpetrated willfully, wantonly, and / or purposefully on Plaintiff.

173.   As a direct and proximate result of the Defendants' conduct, Plaintiff has suffered serious and permanent injuries, including pain and suffering, loss of capacity for the enjoyment of life, pelvic, groin and vaginal pain and suffering, complex extrusions and erosions of the mesh in her body, chronic inflammation with swollen inflamed tissue in her groin and vagina, mesh adhesion to surrounding tissue, tissue damage, failure of the mesh to treat her underlying condition and worsening of stress urinary incontinence, new onset urinary and pelvic complications, mesh deformation including coiling, contracting and curling of the mesh, mesh hardening, stiffening and folding over, scar-plating, intervention for her pain including the need for painful surgical interventions to remove the mesh, as well as the need for continuing and future medical care and treatment. She has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

## COUNT VIII – PUNITIVE DAMAGES

174.   Plaintiff incorporates by reference paragraphs 10 - 93 of this Complaint as if fully set forth in this Count.

175.   Defendants sold the device to Plaintiff's healthcare providers and other healthcare providers in the State of Florida and throughout the United States without doing adequate testing to ensure that the device was reasonably safe for implantation in the female pelvic area.

176.    Defendants sold the device to Plaintiff's health care providers and other health care providers in the State of Florida and throughout the United States in spite of their knowledge that the device caused severe complications and injuries, including, but not limited to the injuries suffered by Plaintiff.

177.    At all times relevant hereto, Defendants knew or should have known that the device was inherently dangerous with respect to the risks of life-long irreversible injuries, complex recurring erosions, extrusions, failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to treat the conditions proximately related to the use of the product, as well as other severe and personal injuries which are permanent and lasting in nature.

178.    At all times material hereto, Defendants misrepresented material safety facts about the safety of the device.

179.    Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff and her treating physicians, concerning the safety and efficacy of the device.

180.    At all times material hereto, Defendants knew and intentionally and / or recklessly disregarded the fact that the devices cause debilitating, irreversible and catastrophic side effects with greater frequency than safer alternative products and / or methods of treatment and recklessly failed to advise healthcare providers, Plaintiff, her treating physician, the public of same.

181.   At all times material hereto, Defendants intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the true and accurate risk of injuries and complications caused by the devices.

182.   Notwithstanding the foregoing, Defendants continue to aggressively market the device to consumers, including Plaintiff and her treating physician, without disclosing the true risk of side effects and complications and with fraudulent claims.

183.   Defendants know of the devices' defective and unreasonably dangerous nature, but continue to manufacture, produce, assemble, market, distribute, and sell the devices so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious or reckless disregard of the foreseeable harm caused by the devices.

184.   Defendants continue to intentionally or recklessly conceal or exercise gross negligence in failing to disclose to the public, including Plaintiff, the serious side effects of the device in order to ensure continued and increased sales.

185.   Defendants intentionally, recklessly or negligently failed to disclose information deprived Plaintiff and the public of necessary information to enable them to weigh the true risks of using the device against the benefits. The Defendants' failure constitutes willful or wanton behavior, or gross negligence.

186.   As a direct and proximate result of the foregoing acts and omissions, Plaintiff has required and will require health care and services, and has incurred medical, health care, incidental, and related expenses. Plaintiff is informed and believe and further allege that Plaintiff will in the future be required to obtain further medical care and / or hospital care and medical services.

187.   Defendants' conduct, as described herein, shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Plaintiff Tatum Finocchiaro respectfully requests that she be awarded a judgment against Defendants for the following:

a)   Actual damages;

b)   Prejudgment and postjudgment interest;

c)   Punitive or exemplary damages;

d)   Attorneys' fees;

e)   Costs of suit; and

f)   All other relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action.

<u>Dated</u>: March 23, 2023

Respectfully submitted**,**

**THE MAHER LAW FIRM**

/s/ *Jason R. Fraxedas*_____
Jason R. Fraxedas, Esq.
Florida Bar # 63887
Matthew S. Mokwa, Esq.
Florida Bar # 47761
The Maher Law Firm
398 W. Morse Blvd, Suite 200
Winter Park, FL 32789
407-839-0866
jrfraxedas@maherlawfirm.com
mmokwa@maherlawfirm.com

**ATTORNEYS FOR PLAINTIFF**